IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

AARON A. ALEXANDER,          )

                    Plaintiff     )

v.                        )     CIVIL ACTION NO. 07-0333-CB-C

BALDWIN COUNTY BOARD OF     )
EDUCATION,
                   Defendant,   )

## OPINION AND ORDER

This matter is before the Court on a motion for summary judgment filed by the defendant. (Doc. 33.)  The parties have filed evidentiary submissions and thoroughly briefed the issues which are now ripe for resolution.  On summary judgment, defendant challenges the sufficiency of plaintiff's evidence to prove employment discrimination.  After considering the relevant facts in the light most favorable to the plaintiff, the Court finds that summary judgment is due to be granted.[1]

### FINDINGS OF FACT

At all times relevant to this action, plaintiff Aaron Alexander, an African American, was employed by the defendant, the Baldwin County Board of Education (the Board), as a Buildings & Grounds Manager (BGM).  Alexander was the BGM at Daphne High School (DHS), a position he had held for approximately twenty years.  In June 2005, he applied for a newly-created position, Preventative Maintenance Manager, along with thirteen other applicants.

---

[1]In light of this summary judgment order, the Court finds the following motions to be **moot**: (1) defendant's motion to supplement its expert report (Doc. 44), (2) defendant's motion to strike portions of the EEOC file (Doc. 45) to strike Dr. Wilson's report (Doc. 46) and defendant's motions related to the exclusion of Dr. Wilson's testimony (Docs.  48-50).

Alexander was not selected for the position.

The Preventative Maintenance Manager (PMM) position was the brainchild of David Maxime, the Director of Planning and Operations (DPO), for the Baldwin County School System (the School System).  Maxime was in charge of operations for all the System's buildings, facilities, equipment and grounds.  Since becoming DPO in 2003, Maxime had noted that a couple of schools–DHS and Foley High School–had significant cleanliness and maintenance issues.  Because there was no standard practice with respect to cleaning and maintaining facilities, training staff or preventative maintenance, Maxime proposed the hiring of a PMM to develop a comprehensive system-wide program for maintenance and custodial work.  School system administrators were receptive to his proposal, and the Board ultimately created the position.

The job description for the position read as follows:

SUMMARY: Establish and monitor preventative maintenance guidelines for mechanical systems; train custodians in cleaning techniques; monitor and maintain contracts with Baldwin County Public Schools.

ESSENTIAL DUTIES AND RESPONSIBILITIES include the following:

Lead efforts to create a proactive maintenance environment on each campus, including providing[,] developing and implementing routine maintenance seminars for Buildings and Grounds Managers and their staff.
Work closely with maintenance supervisors in an effort to improve preventative maintenance programs within the system.
Lead efforts necessary to ensure critical PM schedules are in full compliance.
Work closely with Principals to enhance a clean and healthy facility.
Work closely with Building Managers and custodial staff to ensure a successful routine maintenance program.

JOB REQUIREMENTS:

Five (5) years minimum building and grounds maintenance experience.
General knowledge of mechanical equipment

2

Proficient with written and verbal communications
Strong interpersonal, coaching and people development skills; able to motivate
others to implement projects and goals.

(Doc. 40-10.)

Maxime interviewed all of the applicants for the PMM position.  Eight of thirteen applicants were BGMs within the School System.  Maxime selected three finalists: Alan Blackburn, BGM at Fairhope High School; Harry Bryars, BGM at Bay Minette Elementary School and Alan McDonald, BGM at Baldwin County High School. Blackburn and McDonald are white.  Bryars is African American.  Maxime visited the campuses of each of the top three candidates to look at the preventative maintenance programs and other procedures.

Ultimately, Maxime recommended that the Board hire Blackburn as the PMM, and it did.[2]  Maxime believed that Blackburn was the best candidate primarily because of the job he had done with maintenance at Fairhope High School. According to Maxime, "Blackburn's school was one of the best looking schools I have ever seen in my 25 year career with school systems."  (Maxime Aff., Doc. 34-12, ¶ 8.)  But "[m]ore importantly, [Maxime] was able to review [Blackburn's] programs and determine that [he] wanted those types [of] systems developed and implemented system-wide."  (*Id.*)  "Blackburn [had] developed, on his own, and implemented at Fairhope High School, a very comprehensive system for all custodians, all equipment, seasonal issues, grounds, etc. that very effectively kept his school maintained in impeccable condition."  (*Id.* ¶ 9.)  Maxime "never saw Fairhope High School in bad shape inside

---

[2]Maxime may have felt pressure to hire Blackburn from two of the System's assistant superintendents, JaNay Dawson and Terry Knight.  Both were former principals of Fairhope High School.  Both had worked with Blackburn, and both thought highly of him.  When Maxime initially proposed creating the position, Dawson expressed her opinion that Blackburn would be the best person for the job.

or out, whether it be in the summer or when the school was short on custodial staff."  (*Id.* ¶ 13.)

Also, Maxime "was familiar with Blackburn's vast background in fields that required, training,

supervising, preventative maintenance development, machine operation and construction." [3] (*Id.*

¶ 12.)

    In contrast, Maxime had continually observed maintenance problems at DHS.  These

included work orders sent to the central office for work that, in Maxime's opinion, should have

been done by the BGM; cleanliness issues both inside and outside the school; and the condition

of the building.  Maxime believed that preventative maintenance could have alleviated some of

these problems.  Maxime personally observed conditions at DHS during numerous visits to the

school and verbally reported deficiencies to DHS Principal, Barry Pennington, Alexander's

supervisor.[4]  DHS Assistant Principal Larry Clark was responsible for day-to-day supervision of

Alexander.  Clark thought that Alexander did a good job and always gave him excellent

evaluations.  In his deposition, Clark admitted, however, that sometimes Pennington may have

communicated directly with Alexander about maintenance issues.  While Clark disagreed with

---

[3]Blackburn indeed had a long and varied work history that involved construction, machinery, maintenance and supervision.  In junior high in the 1970's, he did part-time custodial work at his school in Robertsdale.  In high school he was employed at a marina, where he worked on small engines and ran a forklift.  After high school, he worked for several years as a shipfitter, then for a few years with a concrete company pouring foundations. Next, he worked in construction on large projects such as condos and industrial facilities.  Blackburn became a supervisor and safety director in the construction business.  Due to construction layoffs, he worked at International Paper where he became a foreman.  He then began his own construction company, which he ran for a few years.  From there, he worked for about a year for a glass company, cutting and installing glass in homes and automobiles.  For the next few years, Blackburn worked as an operator at a chemical plant until 1994 when he became BGM at Fairhope High School. (Blackburn dep., Doc. 34-8, 11-36.)

[4]BGM's actually reported to their school principals, although the DPO had input into their responsibilities.

some specific maintenance deficiencies pointed out by Maxime, he acknowledged that deficiencies may have been observed at DHS.  Clark nonetheless believed that Alexander was doing a good job because  the problems that did exist were due to factors beyond Alexander's control.[5]

In response to the Board's promotion decision, Alexander filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC).  The EEOC conducted an investigation and issued a determination finding "reasonable cause based upon the entire record to conclude that [Alexander] was not promoted. . . because of his race."  (EEOC Ltr., Doc. 40-5.)  After setting out the parties' respective positions, the EEOC found that "[the] decision maker used a subjective method to arrive at whether [Alexander] was qualified for the position" and that Alexander was consistently rated highly on his performance evaluations.[6]  Next, the EEOC addressed Alexander's "allegations that [the Board] discriminates against Blacks as a class and that he individually was subject to disparate promotional opportunities" stating as follows:

---

[5]For instance, when asked about an assertion that the DHS campus had an unkempt appearance due to overgrown grass and trash on the grounds, Clark replied, "I think that's not true unless it was one of those periods in which they were doing the floors or we were shorthanded."  (Clark dep., Doc. 34-4, 115.)  Clark admitted that sometimes the campus "was not as clean as it could have been.  But it would be because we would be shorthanded."(*Id.* 58.)  Similarly, Clark admitted that ceiling tiles often needed to be replaced due to leaks in the roof caused by structural problems.  (*Id.* 108-110.)

[6]The EEOC paraphrased the Board's reasons for its decision as follows:  "[Alexander] was not one of the finalists because of his shortcoming as a supervisor [and] because his school was not kept as clean as the schools of several other applicants."  (*Id.*)  The finding that Alexander got good evaluations arguably addresses the assertion that he had shortcomings as a supervisor.  Significantly, the EEOC never addressed the Board's second reason for its decision–that the school was not as clean as those of other candidates.

5

> According to the 2005 U.S. Census Bureau (Baldwin County) the area from
> which [the Board] draws its workforce is composed 87.9% White population and
> 10.2% Black population.  The Respondent's record of employment shows that 65,
> 68 and 75 White employees to four Blacks were employed in the planning and
> operations department since the school year 2003 to 2006, and there are
> inferences that only two Blacks have been employed in the department at one
> time.  Because overt discrimination in employment is seldom direct, the courts
> have found statistical evidence to be highly probative of the existence of a pattern
> or practice of unlawful discrimination.  It is therefore concluded that [the
> Board's] promotional practices and procedures discriminate against Black[s] as a
> class.

(*Id.*)  After the EEOC's conciliation efforts were unsuccessful, plaintiff filed this lawsuit.

As part of this litigation, Alexander commissioned a "sociological [statistical] analysis" of the "organizational characteristics and [ ] the occupants of positions within the Baldwin County Board of Education."  (Wilson Rpt., Doc. 40-39, 2.)  This study was conducted by Michele Wilson, PhD, a professor of sociology.  Based on a demographic analysis of 2,196 positions within the Baldwin County School System, Dr. Wilson reached the following conclusions:  (1) African-Americans are under represented among some categories of employees as compared to their general availability in the workforce; (2) the retention rate for African-Americans, in general, is lower than for whites; and (3) "[t]he pattern of advancement leading to becoming Building and Grounds Managers and thus to be eligible to be the Preventative Maintenance Manager appears to be compromised for African-Americans compared to Caucasians."  (*Id.* 6.)

**LEGAL ANALYSIS**

**Introduction**

In this action, brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, plaintiff contends that the defendant's promotion decision was the result of

intentional discrimination.  In its summary judgment motion, defendant asserts that race played

no part in its decision and that its decision was based on legitimate nondiscriminatory reasons.

In response, plaintiff argues that defendant's reasons are not the true reasons for its decision but

are merely a subterfuge for discrimination.  Below the Court sets out the standard applicable on

summary judgment as well as the applicable analytical framework before addressing the merits

of the claim.

**Standard of Review/Analytical Framework**

> ***Summary Judgment***

Summary judgment should be granted only if "there is no issue as to any material fact

and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The

party seeking summary judgment bears "the initial burden to show the district court, by reference

to materials on file, that there are no genuine issues of material fact that should be decided at

trial."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party

has satisfied his responsibility, the burden shifts to the nonmoving party to show the existence of

a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing

on an essential element of her case with respect to which she has the burden of proof,' the

moving party is entitled to summary judgment."  *United States v. Four Parcels of Real Property*,

941 F.2d 1428, 1437 (11th Cir. 1991) (footnote omitted)(quoting *Celotex Corp. v. Catrett,* 477

U.S. 317 (1986)).   "In reviewing whether the nonmoving party has met its burden, the court

must stop short of weighing the evidence and making credibility determinations of the truth of

the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998-

99 (11th Cir. 1992) (internal citations and quotations omitted).

The factual disputes raised by the nonmoving party must be both *material and genuine*. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "'Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 918 (11th Cir. 1993)).

### *Title VII Framework*

The following analytical framework is applied to Title VII disparate treatment claims based on circumstantial evidence, such as plaintiff's claim for failure to promote:[7]

> Because direct evidence of discrimination can be difficult to produce, the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 36 L.Ed.2d 668 (1973), created a framework on the burden of production and order of presentation of proof to analyze circumstantial evidence of discrimination. . . . To prove discriminatory treatment through circumstantial evidence: (1) a plaintiff must first make out a prima facie case, (2) then the burden shifts to the defendant to produce legitimate, nondiscriminatory reasons for the adverse employment action, and (3) then the burden shifts back to the plaintiff to establish that these reasons are pretextual.

*Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1375 (11th Cir. 1996) (internal citations omitted).

---

[7]There is no direct evidence of discrimination in this case.

8

The issues in this case focus on the third prong of the *McDonnell Douglas* framework. For purposes of summary judgment, the Court will assume that plaintiff can prove a prima facie case of discrimination,[8] and there is no question that defendant has articulated legitimate nondiscriminatory reasons for its decision.  The primary question is whether plaintiff has presented sufficient evidence of pretext.  Plaintiff also contends that the Court should consider the EEOC's probable cause determination as evidence to preclude summary judgment, although he does not explain where that evidence fits within the *McDonnell Douglas* framework.

**Pretext**

Proof of pretext is essential to plaintiff's ability to survive summary judgment.  In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), the Supreme Court explained how the pretext element works:

> "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." . . .  And in attempting to satisfy this burden, the plaintiff-once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision-must be afforded "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence."

*Id.* at 143 (quoting *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). To determine whether plaintiff's evidence of pretext is sufficient to create an issue of fact on

---

[8]Defendant argues that the plaintiff cannot prove a prima facie case because he is unable to show that he was *more* qualified than Blackburn for the PMM position. Plaintiff counters that he need only prove that he was qualified.  Due to a split of authority in the Eleventh Circuit, both positions find support in circuit case law.  *See Walker v. Mortham*, 158 F.3d 1177 (11th Cir. 1998) (tracing origins of conflicting authority).  This Court need not decide which line to follow since plaintiff ultimately cannot meet his burden of proving pretext.

summary judgment, "the district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"*Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3rd Cir. 1996)).   In his quest to prove pretext, "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."  *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).  Furthermore, the plaintiff must rebut *each* legitimate nondiscriminatory reason proffered by the defendant.  *Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007).

Defendant has proffered two legitimate nondiscriminatory reasons for promoting Blackburn rather than plaintiff to the position of PMM: (1) Maxime found plaintiff's job performance to be poor; and (2) Blackburn was more qualified for the job. To demonstrate that these reasons are pretextual, plaintiff has offered two types of proof.  The first is evidence that the facts used to justify these reasons are not true.  The second is evidence by which the plaintiff seeks to demonstrate that the defendant did not actually rely on the reasons given.

### *Plaintiff's Evidence Does not Contradict Defendant's Proffered Reasons*

With respect to the issue of job performance, the question is whether Maxime had a good faith belief that plaintiff's job performance was subpar.  *See E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176-77 (11th Cir. 2000) (in misconduct case pretext inquiry is not whether

employee is guilty of misconduct but whether employer reasonably believed that she was when it terminated her).  To demonstrate that the *observations* on which Maxime's opinion were based were incorrect, plaintiff cites the deposition testimony of Assistant Principal Larry Clark. Maxime testified that he had continually observed maintenance and cleanliness problems at DHS and that the condition of DHS and one other school was the impetus for creating the PMM position in the first place.  In contrast, Clark testified the campus was always clean and well-maintained. While insisting that this was the case, Clark admitted that there may have been times when the grass was too high or the campus was not as clean as it should have been.  Clark just did not believe plaintiff was to blame when those things occurred.  Hence, Clark's testimony does not dispute Maxime's observations of maintenance deficiencies on the DHS campus.[9]

To dispute the good faith of Maxime's *opinion* that his job performance was poor, plaintiff points to his excellent performance evaluations.  But Maxime was not plaintiff's supervisor and did not have any input into plaintiff's evaluations.  Clark was the person responsible for those evaluations.[10]  That two people viewing the same set of facts have a different opinion does not make one opinion less credible than the other.  In fact, it is not surprising that Assistant Principal Clark, (who apparently saw what plaintiff could accomplish under the circumstances) and Maxime (who saw the maintenance problems at DHS as compared

---

[9]Plaintiff also attempts to create an issue of fact by pointing to the absence of evidence, that is, that the defendant never reduced to writing any of the maintenance deficiencies observed at DHS.  If the absence of written documentation created an issue of fact, then plaintiff would have no burden of proving pretext at all.

[10]Moreover, Maxime and Clark did not communicate directly about maintenance issues. When Maxime saw problems at DHS, he brought those problems to the attention of Principal Pennington.

with other campuses) had differing opinions about plaintiff's job performance.

Plaintiff's qualifications evidence is likewise insufficient to create an issue of fact as to pretext.  When a plaintiff attempts to demonstrate pretext solely by comparing his qualifications to the qualifications of the person promoted, "the difference in qualifications must be so glaring that no reasonable impartial person could have chosen the candidate selected for the promotion in question over the plaintiff."  *Vessels v. Atlanta Indep. School Sys.*, 408 F.3d 763, 772 (11th Cir. 2005). Interestingly, plaintiff essentially concedes that he cannot meet the "relative qualifications" burden.  He states that "contrary to the Board's argument, Alexander <u>did</u> possess strong qualifications for the position, Preventive Maintenance Manager, superior in some respects [to] those of Alan Blackburn."  (Pl.'s Brf., Doc. 40-2, 6 ).  At this stage, the question is not whether plaintiff believes he was better qualified, *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163-64 (11th Cir. 2006).  Plaintiff points to the difference in his background and experience and that of Blackburn, none of which appears to have much relevance to the promotion decision in this case.[11]  Possessing strong qualifications "superior in some respects" to Blackburn does not describe a difference so glaring that no reasonable person could have chosen Blackburn over plaintiff.

---

[11]For example, plaintiff points out that he had 20 years' experience as a BGM, twice as much as Blackburn but does not explain how that made him more qualified for the job.  Both had the requisite five years' experience working in buildings and ground maintenance required to qualify for the job.  Alexander points out that he held a post-secondary degree and that Blackburn had no post-secondary degree.  But a post-secondary degree was not a qualification. There is no evidence that these qualifications–length of services as a BGM or a post-secondary degree–were important considerations for the defendant.  Simply put, plaintiff has attempted to prove pretext by substituting his own opinion about job qualifications for that of the defendant. That is not allowed.  *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) (plaintiff may not demonstrate pretext by questioning the wisdom of employer's decision).

Plaintiff has failed to create an issue of fact as to the credibility of either–much less both- -of defendant's legitimate nondiscriminatory reasons for its promotion decision him.  Next, the Court must address plaintiff's evidence that the reasons given–even if factually correct–are not to be believe.

### *Plaintiff's Other Evidence Does Not Create Issue of Fact as to Plaintiff's Reliance on Proffered Reasons*

Plaintiff relies on three types of evidence as proof that discrimination–not qualifications or job performance–is the true reason he was not selected for the PMM position.  First, plaintiff points to evidence that the defendant "preselected" Blackburn to be PMM before the position was even created.  Second, he points to evidence that the Board made false statements in its submissions to the EEOC.  Third, he points to statistical evidence that, he contends, shows a pattern and practice of racial discrimination.

Plaintiff's evidence of preselection is quite thin and is based almost entirely on hearsay and innuendo.[12]  But even if it the evidence were admissible, preselection alone is not evidence of pretext or discriminatory intent.  *Springer v. Convergys Customer Mgmt. Group*, 509 F.3d 1344, 1350 (11th Cir. 2007).  Indeed, preselection of the most qualified candidate is a legitimate nondiscriminatory reason.  *Id.*

Next, plaintiff argues that the defendant's reasons are pretextual because its letters to the EEOC misrepresented both plaintiff's record and some of the reasons for the promotion decision. In fact, there were some inaccuracies in defendant's EEOC correspondence. But those were

---

[12]Plaintiff cites: (1) hearsay and rumors within the School System, (2) statements by Knight and Dawson to Maxime that Blackburn would be a good person for the job and (3) Blackburn's statement after he received the promotion that he knew he would get the job.

13

letters prepared by defendant's lawyers for an adversarial proceeding.  Evidence that defendant's lawyers did not get their facts straight after the promotion decision had been challenged is not proof that the promotion decision was a pretext for discrimination.

Finally, plaintiff's statistical evidence is insufficient to prove pretext.  While statistical evidence can be an acceptable method of proving of pretext, *see Miles v. M.N.C. Corp.*, 750 F.2d 867 (11th Cir. 1985), "'proof of pretext by statistics alone is a challenging endeavor.'" *E.E.O.C. v. Texas Instruments, Inc.*, 100 F.3d 1173, 1184-85 (5th Cir. 1996) (citing *Walther v. Lone Star Gas Co.*, 977 F.2d 161, 162 (5th Cir.1992)).  The problem is that statistics generally have "'little direct bearing on the specific intentions of the employer [with regard to] a particular individual.'" *Hughes v. Alabama Dept. Of Public Safety*, 994 F. Supp. 1395, 1403 (M.D. Ala. 1998) (quoting *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 847 (1st Cir. 1993)).  "Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of pretext. A plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals."  *Pippin v. Burlington Resources Oil & Gas*, 440 F.3d 1186, 1197 (10th Cir. 2006) (internal quotations and citations omitted).  Statistical evidence must compare "individuals who are similarly situated with respect to decision makers, job types, departments, and the specific criteria relevant for the jobs in question."  *Cooper v. Southern Co.*, 390 F.3d 695, 717 (11th Cir. 2004).

Plaintiff's statistical evidence does not prove pretext because it is either irrelevant to the issues at hand or based on faulty assumptions.  Plaintiff's expert, Dr. Wilson, prepared a statistical analysis of 2,196 positions in the Baldwin County School System over a ten-year

14

period and reached three conclusions that plaintiff relies on as evidence of pretext.  Two of those conclusions-- the underrepresentation of African Americans in some broad job categories and the lower retention rate for African American employees--that have no relevance here because they do not purport to compare similarly situated individuals.

The remaining conclusion–that the "pattern of advancement" to the PMM position is "compromised" for African Americans–may purport to compare similarly situated individuals, but the analysis has serious flaws.  The theory, which is not stated clearly, appears to be as follows: To be hired as PMM one must have five years' experience as a BGM in the Baldwin County School System, but due to discrimination African Americans are less likely to rise through the ranks to the BGM position and, therefore, more likely to be excluded from the PMM position. The theory is based on a series of faulty assumptions, and nowhere in that series of assumption is there any evidence of discrimination.  First, there was no actual requirement that a candidate have five years' experience as a BGM.[13]  The racial makeup of BGM's, according to Dr. White, is 77.4% white and 22.6% black, but Dr. White drew no inference of discrimination at this level.  Instead, she asked "What is the 'conduit' to becoming a BGM?"  That question is not followed by an answer but by an observation that a large percentage of African American BGM's (66% or 8 of 12) were custodians before becoming BGM's while only 29% of white BGM's had been custodians.  In other words, some were custodians and some were not.  In her

_____

[13]One of the requirements listed in the job description was "[f]ive (5) years minimum building and grounds maintenance experience," but it did not require that the experience be as a BGM with the School System.  Nonetheless, Dr. White *assumed* "that anyone, to be considered had to have five years experience as a Buildings and Grounds Manager." (White Rpt., Doc. 40-39, 4.) Although the report does not specifically say so, Dr. White has further assumed that the job listing limits applicants to those who have experience as BGM's in the Baldwin County School System.

rebuttal report, Dr. White attempted to clarify, stating that "[t]here is an apparent difference, by race, in the path to becoming a BGM." (White Rebuttal, Doc. 40-41, 4).  That is a far cry from saying that African Americans were prevented from becoming BGM's because of their race. Simply put, Dr. White found no "conduit" to the BGM position, much less one affected by discrimination.  Finally, even if Dr. White had concluded that discrimination prevented African American's from becoming BGM's, that conclusion would have no relevance to the issue of pretext in this case.  Plaintiff was a BGM, and his lack of experience as a BGM had nothing to do with defendant's promotion decision.

**The EEOC Determination**

Plaintiff argues that the EEOC's probable cause determination "constitutes evidence admissible in this case and is probative of discrimination."  (Pl.'s Brf. 17.)  Plaintiff does not include this in his pretext argument, and the Court is left to wonder exactly how it might fit into the McDonnell Douglas framework.  If it is intended as circumstantial evidence of discrimination to be considered outside the *McDonnell Douglas* framework, it fails.  It is true that an EEOC determination is admissible in evidence if the trial court determines that the report's probative value outweighs the likelihood of unfair prejudice.  *Barfield v. Orange County*, 911 F.2d 644, 651 (11th Cir. 1990).  But even an admissible EEOC report, is "[not] a free pass through summary judgment."  *Mondero v. Salt River Project*, 400 F.3d 1207, 1215 (9th Cir. 2005); *see also  Septimus v. University of Houston*, 399 F.3d 601, 610 (5th Cir. 2005) (plaintiff could not proceed past summary judgment despite EEOC determination in her favor without

evidence to dispute defendant's legitimate nondiscriminatory reason).[14]

**Conclusion**

      For the reasons set forth above, the Court finds that the evidence presented by plaintiff in response to defendant's summary judgment motion does not create a genuine issue of material fact.  Accordingly, it is **ORDERED** that the motion for summary judgment be and hereby is **GRANTED**.

      **DONE** and **ORDERED** this the 12th day of August, 2008.

                                    *s/Charles R. Butler, Jr.*
                                      **Senior United States District Judge**

---

[14]Plaintiff would fare no better if he offered the EEOC determination as evidence of pretext because the EEOC's conclusions are not supported by the summary judgment evidence. *See Cruz v. Aramark Serv., Inc.*, 213 Fed. Appx. 329, 335 (5th Cir. 2007) (EEOC determination not supported by summary judgment evidence is insufficient to create issue of fact).  The reasons given by the EEOC for the probable cause determination were: (1) the decision maker used subjective criteria; (2) the plaintiff received high performance evaluations and no performance evaluations were submitted for the person promoted; and (3) between 2003 and 2006 the racial makeup of the Planning and Operations Department, did not reflect the racial makeup of the county as a whole.  On summary judgment, plaintiff has not asserted that subjective criteria rendered the decision pretextual.  The performance evaluations, or lack thereof, are only a very small portion of the summary judgment evidence regarding the qualifications of plaintiff vis a vis Blackburn.  *All* of the qualifications evidence, and the reasons plaintiff has failed to prove pretext, have been discussed above.  Finally, the EEOC's statistical evidence has been discredited by experts for both plaintiff and defendant. The EEOC concluded there was intentional discrimination because, over a three-year period, only 4 of 69, 72 and 79 persons employed in Planning and Operations Department in those years were African American. Defendant's expert opined that the EEOC's statistical analysis was flawed because it did not employ traditional statistical methods that included a measure of confidence intervals. (Gundlach Rpt., Doc. 34-13, 2.)  As plaintiff's expert put it:  "The analysis using 69, 72 and 79 cases is meaningless because of a lack of statistical power."  (Wilson Rebuttal, Doc. 40-41, 1.)